# THOMAS WARREN *vs.* OCEAN INSURANCE COMPANY.

The authority of an agent to act for a corporation, need not be proved by record or writing, but may be presumed from acts, and the general course of business.

Where by the uniform practice of an insurance company, a deviation from the risk assumed in the policy is waived by the President, for a compensation agreed upon by him and by the assured, and the waiver and assent with the terms thereof are written across the policy, without any new signature, and recorded by the secretary ; a contract made in that manner, is binding upon the corporation.

And after such contract has received the assent of the assured and of the President of the company, and has been written upon the policy, it is the act of the corporation, although the secretary may not record it upon the record book.

Where the custom of an insurance company is to dispense with the signature of the assured to the premium note until after the policy is recorded, the omission to sign the note when the risk is taken, does not render the contract void from want of consideration.

In an action on a policy of insurance, it is competent for a Judge at the trial, to permit an amendment of the declaration by adding a new count, varying from the original, only in the date of the policy declared on.

ASSUMPSIT on a policy of insurance, for the plaintiff and for whom it may concern, on the brig *Pactolus,* dated *March* 5, 1838, for her voyage from *Havana* to her port of discharge in the *United States,* and averring a total loss by the perils of the seas, within the risk taken by the company. Before any plea was put in, the plaintiff moved for leave to amend, by filing a count similar in all respects to the first, excepting that the date of the policy was alleged to be on the *fourteenth,* instead of the *fifth* of *March,* the policy being set out at length in each count. The defendants objected to the amendment, but it was permitted by EMERY J. who presided at the trial. The *Pactolus* was lost *February* 21, 1838, *in going from Havana to Matanzas* by perils of the sea. The policy of insurance numbered 3427, when produced at the trial, had upon it, written across its face in the handwriting of the secretary, in red ink, these words. "*The brig herein named with cargo, has liberty to proceed from Havana to Matanzas to finish loading, and the risk to be continued at and from thence to her port of discharge in the United States, cargo valued at the same. For*

*which the sum of forty dollars is added to note* 3427. *March* 14, 1838." A writing on the policy in blue ink was spoken of by the witnesses, but the copies do not show its tenor. It seems to have been a protest by the defendants, that they were not bound by the policy, made after the writing in red ink, and when the plaintiff was not present. Several witnesses testified in relation to the time when, and the circumstances under which the writing in red ink, called the *healing* of the policy, was made. The variations in statement, are material only on questions of fact, settled by the jury, and are unimportant in determining the questions of law. The statement by the secretary at that time, who was called by the defendants, is in substance this. On the morning of *March* 14, 1838, about half past 8 o'clock, the President of the company, *Bartol*, and Col. *Warren*, the plaintiff, came into the office together; that *Warren* came in stating, that he had received a letter from the master of the *Pactolus*, saying, that he was at *Havana* partly loaded, and should proceed next day to *Matanzas* to finish loading; *Warren* remarked, that he believed his policy was then in the office, and witness told him he believed it was; *Bartol* told *Warren* " it ought to be healed," or, " you want to heal it;" *Warren* said he wanted it healed, and asked *Bartol*, what he would charge him for liberty to go to *Matanzas;  Bartol* told him he would do it for a half per cent.; *Warren* inquired, whether that was the usual rate, what we were in the habit of charging. *Warren* then concluded to give it, and have it healed, and told *Bartol* so ; they both requested the witness to make the necessary writing and put it on the policy ; witness took a separate piece of paper and wrote on it what he thought necessary, and asked *Warren* if that would answer ; *Warren* said yes, and witness then wrote it in red ink athwart the policy. After he had copied the paper on to the policy, he then turned to the register, and began to copy it there. *Woodbury*, a director, came in after the bargain was made, while the witness was copying from the separate piece on to the policy, and asked what the Colonel wanted ; *Warren* said he had been getting some insurance, and witness thinks *Warren* asked, if half per cent. was not too much, and *Woodbury* said no, not half enough. After the witness had finished the writing on the policy, and had written one word on the record book, *Farmer*, another di-

rector, came in with a letter in his hand, and said, Colonel, do you know your *Pactolus* is in trouble ? Witness ceased writing, and *Warren* in reply to *Farmer* said, where, what ; *Farmer* was at the desk looking over the letter, and *Warren* went and looked over his shoulder, and appeared to be reading the account of the loss, and as soon as he got through went out of the office, this being about nine o'clock. Witness asked if he should go on ; *Bartol* and *Woodbury* said "no, stop where you are." This was before *Warren* went out. *Warren* said nothing before he went out about giving a note or paying the premium. About a month after the healing, heard *Warren* and *Bartol* in conversation about the policy, in which *Warren* said "he hoped there would be no tricking about it," and *Bartol* replied, "every thing shall remain as it was." About the same time witness told *Warren* he had several policies in the office and offered them to him, and he replied, that when he took one he would take all, and declined taking any unless he could have that of the *Pactolus*, and witness refused to let him have that, and it was brought into Court by witness on the trial ; *Bartol* promised *Warren* a copy, and he had it. The witness stated that it was customary to leave policies in the office, and has known them to lie until the notes were nearly matured before the assured came in to take the policies and sign the notes ; witness gave up to *Warren* six policies where the risks were then all up but one, and *Warren* had not given any notes for either of them until that time. *Warren* and *Waite*, the owners of the *Pactolus*, were stockholders in the company. The plaintiff called the former secretary of the company, who testified, that the mode of doing business in the office was, that the party wishing insurance, stated what he wanted, and the secretary put it down on the book, and if the President agreed to take the risk, he stated the rate of premium or risk to the secretary, that would be required ; the secretary informed the applicant, and if he assented to the terms the agreement was then entered on the proposal book, and signed by the applicant, and the risk was then considered as taken, and the policy was made out afterward ; that the *healing* did not go on to the proposal book, but went on to the policy, and then into the record ; that policies are frequently left in the office after they are executed, and the premium notes are often left filled up a long time before they are

signed. Usually when the assured takes the policy, he signs the note. The note itself is filled up and numbered, and the assured has nothing to do but to come in and sign it. The proposition first taken down by the secretary, is a mere memorandum, made for the purpose of bringing the subject before the President. When a policy is healed, they generally take another note, but the old note remains as it was. Other witnesses testified, that they had had policies healed at that office, and that it was done by writing in red ink on the face of the policy crosswise in the manner it was on this, and that the notes were seldom signed at the time, and were paid afterwards. Before the suit, the plaintiff offered the amount of the premium for insurance and healing, and it was refused. The case shows, that the 1st, 2d, 3d and 4th articles of the by-laws of the company were read in the case, but are not found in the copies. But from other papers in the case, it appears, that by Article 1, the President, among other duties, was " to take such general superintendance of the institution as will have the most effectual and productive operation." The 4th article provides, that " on concurrence of the President, or in case of his absence or sickness, on the approbation of two directors, as to the terms of insurance, the Secretary shall then proceed to fill up and execute such policy which when completed is to be immediately recorded, and shall be considered binding on the company and on the insured, though the note may not have been given for the premium."

After the evidence on the part of the plaintiff was closed, the counsel for the defendants requested the Judge to order a nonsuit, which was declined.

The counsel for the defendants, requested the Judge to give to the jury the following instructions.

1. That a consideration is necessary to constitute a contract, and that as in the present case, no consideration was paid or secured by said *Warren* to said company, no binding contract was made by said company on the 14th of *March*, 1838.

2. That a verbal promise is not sufficient to constitute a consideration for the supposed contract in this case, unless the contract of insurance was first written, signed, and recorded, according to the by-laws of the company.

3. That in this case, the evidence offered, does not prove a consideration sufficient for any contract of insurance.

4. That an actual or constructive delivery of a policy, or notice that the contract duly executed is completed, is necessary.

5. That the evidence in this csse, does not prove that any contract was made and completed.

6. That the alleged contract was not completed according to the by-laws of the company, and so it created no obligation on the company.

7. That as the original policy was vacated by a deviation to *Matanzas*, prior to the 14th of *March*, when the alleged contract was made, and as the vessel prior to that day was lost, and uninsured, no new insurance could be made by the company on the vessel, that would protect the vessel on her return voyage from *Havana* to *Matanzas*, and thence to the *United States*, unless the same was signed by the President and two directors, and countersigned by the secretary of the company.

8. That a corporation cannot bind itself, except in the mode prescribed in its charter, or in virtue of some contract made by an agent of the corporation duly authorized for the purpose.

9. That a corporation cannot bind itself by any verbal contract.

10. That the law requires the same solemnities and authentication to alter a policy, changing or increasing the risk or premium, as it does to make a new binding policy.

11. That the President of said company has no authority whatever as an officer of said company, except what is given to him in its charter or by-laws.

12. That as it appears by the by-laws of the company, that they do not give any authority to the President to assume or change any risk, beyond the power given by the statutes of the State, the pretended contract on the 14th of *March*, between said *Warren* and the company, did not bind said company.

13. That the conversation which took place in the office on the 14th of *March*, as testified by *Wright*, the secretary, between *Bartol* and *Warren*, and what was written by *Wright*, without completing the record, and without any consideration being paid or secured, with the whole testimony of what ther took place, and was said and done, did not constitute a contract to bind the defend-

ants according to law, and that the testimony in the case, of what took place in the insurance office, at that time before the plaintiff went out of it, and the evidence of what was then done in writing, did not constitute a contract to bind the defendants according to law, and that the action cannot be maintained.

The fourth and eleventh requested instructions were given to the jury without qualification, the residue of the requested instructions, precisely as requested, were not given. But the Judge did inform the jury, that there must be a consideration for a contract: and further instructed them, that it was admitted in the discussion, that the policy of the 5th of *March*, 1838, was correctly made and to be good and binding, but it is not admitted, that the healing afterward attempted, was of any binding efficacy ; that a copy was first read, because the original was in the hands of the defendants, and they had been notified to produce it, but as it is however now produced, it is to be considered as if in at first ; that the defendants put on it the writing in blue lines, lest they should seem to be admitting, that it was fully completed ; and you are to determine the question, how far certain acts have been done in order to render the contract binding. The first inquiry is, was this contract executed ? Next, was it executed under such circumstances as to bind the defendants ? And this question would remain even if the premium note had been signed or paid. The owners are proved to be stockholders in this company, and the by-laws are binding on the company, and it is presumed, that those who are members of the same association, know what those laws were. As individuals they can contract with the corporation of which they are members, as well as a stranger could ; that the usages of the plaintiff as to policies of this office has been shewn, and countenance has been given to those usages by the practice under the by-laws, both as to policies and notes for premium ; that the defendants say that " the contract of the 5th of *March*, was dissolved by deviation, and that the same steps must be taken in healing, as if it were a new insurance," the defendants might waive all objection on account of deviation, if they chose, and the contract remain unaffected by it. Deeds even of lands may be altered by consent of parties. If deeds may be thus altered, contracts not under seal may for a stronger reason.

Was or was not the agreement for the alteration perfected before the news of the loss ? The by-laws are as much binding on the plaintiff as the defendants.

It is not necessary to put the description of alteration about to be made on the proposal book, when the parties understand the facts, unless required.

The agreement of the President and secretary with the plaintiff binds, even if two directors did not agree to it.

The policy filled up and executed is binding, and the recording is not necessary for the insured; if filled up and executed with the assent of the President, it binds, though not recorded.

Impressions of witnesses are not to be received by the jury as evidence.

If from the evidence, the jury are satisfied that the parties agreed, that what was done should not be binding, you must discharge the defendants.

This part of the case must stand or fall by the agreement of the parties *at the time.* And if *Warren* heard the President say, stop, and agreed that the secretary should stop then, *and the business end there*, the plaintiff cannot recover. But if you are satisfied, that the agreement was, that the alteration should be made, and that it was so written on the policy before the President's remark, stop, then the alteration is binding on the defendants. There was sufficient consideration for it.

Other instructions were given by the Judge relating to different points of defence. The verdict of the jury was for the plaintiff on the new count filed. If the instructions given were erroneous; or if any of the instructions requested and withheld ought to have been given, or if on the evidence the action is not maintainable, the verdict is to be set aside. There was a motion for a new trial because the verdict was against evidence, and the whole evidence is reported. But comparatively a small portion of it is here given.

*Mellen* and *Daveis*, for the defendants, argued, that this was a perfect writ at first, and not within the statute of amendments. The same contract cannot begin to exist on two different days. The contract first declared on was one made on the 5th of *March*, and the one declared on in the amended count was made on the

fourteenth. This was introducing a new cause of action. *Rule of Court*, 15.

The nonsuit should have been ordered because the plaintiff had not made out a case showing that the company were liable. This objection may with propriety be examined under the next.

But the main question in this case is, was there enough done on the fourteenth of *March* to make the contract binding on the company? It is confidently contended that there was not.

1. The recording of the policy was a condition precedent to its validity. This was never done, or intended to be done. Before the completion of the contract, so as to make it binding on the parties, information of the loss came into the office, and the defendants refused to go on and complete it. This they had a right to do by law without reasons, and in this case they had abundant cause to justify them. The by-laws of the company required all policies to be recorded, and it is indispensible that it should be done, before it can be the contract of the corporation.

2. It is not the contract of the corporation, because it was not signed by the President, or countersigned by the secretary. Both these are expressly required by the *stat.* 1821, *c.* 139, § 1, " to define the powers, duties and restrictions of insurance companies." Where the statute prescribes the mode in which an act shall be done, it must be done in that way, or the corporation will not be bound. This was the point decided in *Head* v. *Prov. Ins. Co.* 7 *Cranch.* 127. That case has never been overruled, and is decisive of this action in our favor. The *healing* of the policy was a new contract of insurance, and required all the forms of the original one to bind the company. Individuals may contract as they please, but corporations can be bound only in the mode prescribed by law. 2 *Phillips on Ins.* 4 ; *Hayden* v. *Middlesex Turnp.* 10 *Mass. R.* 397 ; 1 *Wash. C. C. Rep.* 93; *Beaty* v. *Marine Ins. Co.* 2 *Johns. R.* 109; *Bank of U. S.* v. *Dandridge*, 12 *Wheat.* 64.

3. There was no consideration for the contract, if one had been made in proper form, and with sufficient authority. The plaintiff gave no note, paid no money, and did not agree to do either.

4. There was no delivery of the policy. This was necessary. The secretary did not agree to keep it for the plaintiff, but refused to do so.

*Deblois*, for the plaintiff.

1. The amendment was properly allowed. The same policy is set out in both counts, and the loss is the same in both in all its circumstances, and it is therefore manifestly the same cause of action. *Stat.* 1821, *c.* 59, § 15; *Rule* 15, *S. J. Court*, 1 *Greenl.* 415; *Bridge* v. *Austin*, 4 *Mass. R.* 115; *Colt* v. *Root*, 17 *Mass. R.* 229; *Green* v. *Lowell*, 3 *Greenl.* 373; *Phillips* v. *Bridge*, 11 *Mass. R.* 246; *Anderson* v. *Brock*, 3 *Greenl.* 243; *Kincaid* v. *Howe*, 10 *Mass. R.* 203; *Leighton* v. *Leighton*, 1 *Mass. R.* 433.

2. The proper mode of declaring was upon the instrument as finally healed and perfected on the 14th of March. *Robinson* v. *Tobin*, 1 *Stark. R.* 268.

3. The contract of *March* 14th was perfected. The terms had been settled, and even the language of those terms reduced to writing, and by the assent of both parties placed upon the policy by the secretary. Nothing remained to be done to complete the bargain and perfect the same. It was not necessary that the signatures should be affixed to what is called the *healing*. By writing the same upon the policy by the secretary, under direction of the President, those very signatures were adopted to the healing or alteration. It is the same as filling up a blank policy signed before by the President and secretary. *Stocking* v. *Fairchild*, 5 *Pick.* 181; *Turner* v. *Burroughs*, 8 *Wend.* 144; *Bell* v. *Marine Ins. Co.* 8 *Serg. & R.* 98; *Kensington* v. *Inglis*, 8 *East*, 273; *Kenyon* v. *Berthen*, 1 *Cowper*, 11, *in note*; *Bean* v. *Steeport*, 1 *Doug.* 11; *De Halm* v. *Hartley*, 1 *T. R.* 343; *Phillips on Ins.* 18; *Robinson* v. *French*, 4 *East*, 140; *Ewer* v. *Washington Ins. Co.* 16 *Pick.* 502. A policy of insurance on a ship, lost or not lost, is good, the ship having been accepted for insurance, and the premium paid, although the policy was not actually executed and stamped, until the loss had happened. *Mead* v. *Davison*, 3 *Adol. & Ellis*, 303. The alteration called a healing, may be made with the consent of both parties, as in a deed, bond or note. *Smith* v. *Croker*, 5 *Mass. R.* 538; *Woolley* v. *Constant*, 4 *Johns. R.* 54; *Zouch* v. *Claye*, 2 *Levinz*, 35; 4 *Com. Dig.* 169, *Fait*, (*F* 1;) *Kershaw* v. *Cox*, 3 *Esp. R.* 246; *Kennerly* v. *Nash*, 1 *Stark. R.* 368.

4. The contract was completed by those authorized on the part of the defendants. The general business of taking risks was entrusted by the by-laws to the President specially, and the intervention of himself and the secretary was all that was necessary to bind the corporation. If they were competent to take the first risk, they were competent to take the additional one from *Havana* to *Matanzas*. *Perkins* v. *Washington Ins. Co. 4 Cowen,* 645. A person may become the agent of a corporation, as he may of an individual, without any deed or writing. Were it not so, there would be no safety in dealing with a corporation, unless it were with a full board of directors. They would have all the advantages of employing agents, and be under no responsibilities for their acts. *Randall* v. *Van Vechten,* 19 *Johns. R.* 60; *Mott* v. *Hicks,* 1 *Cowen,* 513; *Danforth* v. *Scho. Turn. Cor.* 12 *Johns. R.* 231; *Bank of Columbia* v. *Patterson,* 7 *Cranch,* 306; *Dunn* v. *Rector of St. Andrews Church,* 14 *Johns. R.* 118.

5. The recording of the original policy, or of the healing thereon, is a mere ministerial act of the secretary, and constituted no part of the contract between the insurers and the assured. *Kohne* v. *Ins. Co. North America,* 1 *Wash. C. C. Rep.* 93. The secretary is the servant of the company, and not of the plaintiff, and they cannot avail themselves of the neglect of their servant to avoid their contract. 1 *Wash.* 93, *and* 3 *Adol. & Ellis* 303, before cited. The insurers confess themselves to have received the premium in the policy, and it binds them. *Phillips on Ins.* 76; *Marshall on Ins.* 334; 1 *Camp.* 532.

*Preble,* on the same side, remarked, that he had but one point in addition to those of the gentleman who had preceded him. The President was the general agent of the corporation to effect insurances, and his acts are therefore binding upon them. The regulations of the company, and the testimony of all the witnesses, show that he was authorized and employed alone to transact the business. In every instance the President has determined the premium, and taken the risk, without consulting any one.

He replied to the arguments of the counsel for the defendants.

The opinion of the Court was by

EMERY J. — In this case, it is insisted by the defendants that the amendment allowed before issue joined, was in violation of the 15th rule of this Court. The restriction in that rule is, that amendments will not be allowed, unless consistent with the original declaration, and for the same cause of action. By inspecting the declaration, we discover that the same policy is described in both, excepting as to date. Conformably to our practice, we consider that the amendment was warranted. *Matthews* v. *Blossom*, 15 *Maine R.* 400.

The motion for a nonsuit, we think, cannot be sustained, for such *evidence* was exhibited as called for the intervention of a jury to pronounce upon its effect. The case cited from 2 *Peere Williams*, 170, *Da Costa* v. *Scandrett*, is very different from this. That was for an injunction, and to be relieved against the insurance as fraudulent, because *one* having a doubtful account of his ship described like his, was taken, insured her, without giving any information to the insurers of what he had heard, either as to the hazard or circumstances which might induce him to believe that his ship was in great danger, if not actually lost. It was held that the concealing of this intelligence was a fraud. The policy was ordered to be delivered up with costs, but the premium to be paid back and allowed out of the costs. This was decided in 1723.

In the present case, the letter which the plaintiff had received was immediately communicated to the supervising officers of the company, before the healing was agreed upon. This subject seems to have been fully settled by the verdict.

But with the usual candor of the learned counsel for the defendants, it is frankly admitted, that the material part on which they rely is the question, was the contract executed so as to bind the company?

In ordinary circumstances between individuals it is conceded that what was proved to have been done might be sufficient. But it is insisted that the defendants are acting as agents for others, with restricted powers, to be executed only in strict conformity with the provisions of the charter. And that all the prerequisites for the due execution of the original contract should be fully complied

with, in respect to the healing, inasmuch as it was giving life and vigor to a contract which was vacated by the deviation from the original voyage.

We are well aware of the delicacy and difficulty of the situation of the directors of such an institution as that of the defendants. And that therefore the directors may feel bound to press every objection against responsibility on supposed contracts.

It is urged that the case of *Head & Amory* v. *Providence Insurance Company*, 2 *Cranch*, in the opinion of C. J. MARSHALL, which has never been overruled, is decisive of the present case. What is decided there is, that the act of incorporation is to the defendants an enabling act; it gives them all the power they possess; it enables them to contract, and when it prescribes to them a mode of contracting, they must observe that mode, or the instrument no more creates a contract than if the body had never been incorporated.

In the present case, there was no agreement to vacate the first policy, but merely to heal the infirmity resulting from the deviation. In *Head & Amory* v. *Prov. Ins. Co.* it is said in the opinion, that a contract varying a policy is as much an instrument as the policy itself, and therefore can only be executed in the manner prescribed by law.

The inquiry now is rather a question as to the effect of evidence, whether the company, through their officers, have assented to the proposition of the plaintiff for the healing, and acted under it conformably to the requisition of the charter and by-laws of the corporation. 12 *Wheat.* 64, *Bank of U. S.* v. *Dandridge, at page* 73. The verdict has established that it was the same policy, and that the healing was completed.

After the lapse of twenty-three years from the time of the decision of *Head & Amory* v. *Prov. Ins. Co.*, in the case of the *Bank of the U. S.* v. *Dandridge*, though the decision in *Head & Amory* v. *Prov. Ins. Co.* was received and approved, yet in the case of the bank it was said by Justice *Story*, delivering the opinion of the Court, "We do not admit, as a general proposition, that the acts of a corporation, although in all other respects rightly transacted, are invalid merely from the omission to have them reduced to writing, unless the statute creating it makes such writing indispensible as evidence, or to give them an obligatory force. If the

statute imposes such a restriction, it must be obeyed; if it does not, then it remains for those who assert the doctrine, to establish it by the principles of common law, and by decisive authorities. None such have, in our judgment, been produced. By the general rules of evidence, presumptions are continually made in cases of private persons, of acts even of the most solemn nature, when those acts are the natural result or necessary accompaniment of other circumstances. The same presumptions are, we think, applicable to corporations; *acts done by the corporation which presuppose the existence of other acts to make them legally operative are presumptive proofs of the latter.*"

If there be justice in the foregoing suggestion, it cannot be inapplicable to cite the case of *Mead* v. *Davidson*, 3 *Adol. & Ellis*, 303. " Insurance was proposed on the plaintiff's ship *Crisis*, to a mutual insurance society, called the *British Association of London*, of which the plaintiff and defendant were members, in *February*, 1829, and the premium paid, lost or not lost, from *February* 15, 1829, to *February* 15, 1830. The policy was formally executed on the 21st of *October*, 1829. The loss had before that day become known to both parties. By the practice of the society, policies used to be filled up and delivered out as members applied for them. By the rules of the society, the sums insured, were to commence on the day of the ship being accepted by the committee, and to continue in force twelve months from that time, paying five per cent. charge for policies, power of attorney, and two guineas for survey. A nonsuit had been entered with leave to move to set it aside." *Denman C. J.* in the course of his opinion says, " he, the plaintiff, bought and paid for the underwriter's promise to indemnify. If his ship had arrived, the underwriter would have kept the whole premium ; though she has perished he cannot be relieved from his agreement. *Equity would have compelled him to execute the formal policy whenever tendered to him. In voluntarily executing he has only performed a manifest duty, and cannot now retract the obligation.*"

The question in the case of *Head & Amory* v. *Prov. Ins. Co.* was whether a certain paper, written by the secretary but not signed, was a settlement or cancelling by the President and directors.

It is urged, that a by-law should not violate any provision of the charter of corporation. The correctness of this argument is readily acknowledged. But the by-laws should be deemed to have been adopted with an intention of facilitating the exercise of all the powers given by the charter, and should have a liberal construction in order to give just effect to the deliberate arrangement of the corporation, if not found *directly opposed* to *the provisions* of the charter.

We do not perceive that more should be required than to accomplish the expression of the views of the parties, as to what they intended to be bound, in the forms by themselves prescribed, if they are susceptible of being justly considered conformable to the substantial requisitions of the charter. Ought it to be a question whether after the deviation was known, and a consent to heal it, as it is called, and an additional liberty given, on further consideration, it should be considered otherwise than as a waiver of all exceptions as to the deviation. Certainly the corporation were competent thus to waive.

For the purposes of justice, to prevent conclusions unfavorable to the fair views of parties concerned, we must give the same construction as we should give to acts of others in similar circumstances.

We do find that the instrument produced is signed by the President, countersigned by the secretary, recorded as to all which took place on the 5th of *March*, and displaying the healing clause. It appears perfect in its form with different dates, the healing being on the 14th day of *March*.

On the evidence, we find that all the important acts to complete the contract, as between the parties, were done before the secretary began to record the healing. This particular matter was to be performed principally for the benefit and accommodation of the defendants.

We must regard the previous signing by the officers, was by them approved and adopted as sufficient as to the healing clause, without a reiteration of the form of running over with a pen the same letters of their names.

The beginning to record the healing was such a subsequent act, as on this part of the subject carries indubitable presumptive evi-

dence, that all the previous necessary forms had been complied with. We cannot exclude from our consideration the usages of the parties, which we consider were rightly introduced in proof. A contrary construction would draw this consequence, that the act incorporating this company, instead of being an enabling act to effect insurances, would rather become an act for enabling a corporation, acting by its agents, to sustain its agreements when beneficial to them, and to evade them, when disasters came, against which it was apprehended they had insured. Because it would be only necessary to procrastinate the recording of all healings, and take the hazard of being relieved upon some future intelligence.

It may not be too much to say that the peculiarity of the occurrences first presented to the consideration of the office, tending to excite suspicion, might well induce them to bring the subject to judicial investigation ; and the trial before the jury, the proper tribunal for settling such questions, has freed the plaintiff from all imputation of fraud or concealment.

We do not perceive error in the instructions given by the Court to the jury, or in the declining to give the requested instructions, and therefore there must be judgment on the verdict.